**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

| | |
|---|---|
| Hesh's Seafood, Inc. on behalf of itself and all others similarly situated, | Civil Action No. |
| *Plaintiff*, | |
| v. | **CLASS ACTION COMPLAINT** |
| Mowi ASA (f/k/a Marine Harvest ASA), Mowi USA, LLC (f/k/a Marine Harvest USA, LLC), Mowi Ducktrap, LLC (f/k/a Ducktrap River of Maine LLC), Grieg Seafood ASA, Grieg Seafood BC Ltd., Bremnes Seashore AS, Ocean Quality AS, Ocean Quality North America, Inc., Ocean Quality USA, Inc., Ocean Quality Premium Brands, Inc., SalMar ASA, Leroy Seafood Group ASA, Leroy Seafood USA, Inc., and Scottish Sea Farms Ltd. | **JURY TRIAL DEMANDED** |
| *Defendants*. | |

Plaintiff Hesh's Seafood, Inc., on behalf of itself and all others similarly situated, files this Complaint against Defendants Mowi ASA (f/k/a Marine Harvest ASA), Mowi USA, LLC (f/k/a Marine Harvest USA, LLC),  Mowi Ducktrap, LLC (f/k/a Ducktrap River of Maine LLC), Grieg Seafood ASA, Grieg Seafood BC Ltd., Bremnes Seashore AS, Ocean Quality AS, Ocean Quality North America, Inc., Ocean Quality USA, Inc., Ocean Quality Premium Brands, Inc., SalMar ASA, Leroy Seafood Group ASA, Leroy Seafood USA, Inc., and Scottish Sea Farms Ltd. (collectively, "Defendants") for violations of federal antitrust laws.  Plaintiff's allegations are made on personal knowledge as to Plaintiff and Plaintiff's own acts and upon investigation of its counsel and economic consultants as to all other matters.

## NATURE OF THE ACTION

1.     Defendants, who collectively control the majority of the global and United States market for farm-raised salmon, have conspired since at least 2015 by "participat[ing in] or hav[ing] participated in anti-competitive agreements and/or concerted practices related to different ways of price coordination in order to sustain and possibly increase the prices for Norwegian salmon."

2.     According to the European Commission ("EC")—which has an open and active investigation into Defendants' conduct—Defendants facilitated their conspiracy by: (1) coordinating sales prices and exchanging commercially sensitive information; (2) agreeing to purchase production from other competitors when these other competitors offered lower prices; and (3) applying a coordinated strategy to fix, stabilize, maintain, and/or increase spot prices of farm-raised Atlantic salmon in order to secure higher price levels for long-term contracts.  This conduct led to recent unannounced inspections—which the EC carries out as a preliminary step into suspected anticompetitive practices—at the premises of several Defendants in February 2019.

3.     The Food and Agriculture Organization of the United Nations also took note of the skyrocketing prices in the farm-raised salmon sector, observing that the "[s]everely elevated

prices" and "[g]rowth in export revenue for the Norwegian farmed Atlantic salmon industry over the last three years has been truly remarkable."

4.      Since 2015, the farm-raised salmon industry saw prices double and surge to record levels, even as the fish feed cost—which represents more than half of fish farmers' production costs—has decreased due to the use of alternative raw materials.

5.      Defendants' long-standing conspiracy reflected a culture of increasing profits at the expense of Plaintiff and other Class members.  Defendants could not have unilaterally demanded price increases for farm-raised salmon in recent years; they needed to conspire and agree to do so in a coordinated fashion.

6.      But for Defendants' anticompetitive conduct, from at least as early as July 1, 2015, Plaintiff and Class members would have been able to purchase farm-raised salmon at significantly lower prices than Defendants charged. The injury to Plaintiff and the Class is significant and ongoing.

7.      To halt Defendants' anticompetitive practices and to obtain compensation for its payment of artificially inflated prices, Plaintiff brings this action under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 16 of the Clayton Act, 15 U.S.C. § 26, on behalf of itself and all other similarly situated persons.  Plaintiff seeks treble damages for injuries and damages suffered as a result of Defendants' anticompetitive practices, equitable relief in the form of an injunction prohibiting Defendants from engaging in any further illegal conduct, and the costs of this suit, including reasonable attorneys' fees.

## **JURISDICTION AND VENUE**

8.      Plaintiff brings this action to recover treble damages, costs of the suit, and reasonable attorneys' fees resulting from Defendants and their co-conspirators' violations of the Sherman Act, 15 U.S.C. §§ 1, 3.

9.      This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337, and sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a), 26.

10.      This Court also has jurisdiction under 28 U.S.C. § 1332(d) because this action is a class action in which the aggregate amount in controversy for the proposed Class (defined below) exceeds $5,000,000, and at least one member of the Class is a citizen of a state different from that of one of the Defendants.

11.      Venue is appropriate in this District under 15 U.S.C. §§ 15(a), 22, 26, and 28 U.S.C. §§ 1391(b), (c), and (d).  Plaintiff resides and transacts business in this District.  Defendants also reside, transact business, are found, or have agents within this District, and a portion of the affected interstate trade and commerce discussed below was carried out in this District.  Defendants' conduct, as described in this Complaint, was within the flow of, was intended to, and did have a substantial effect on, the interstate commerce of the United States, including in this District. Moreover, the effects of Defendants' conduct on interstate trade or commerce are ongoing.

12.      This Court has personal jurisdiction over each Defendant. Each Defendant has transacted business, maintained substantial contacts, or committed overt acts in furtherance of the illegal scheme and conspiracy throughout the United States, including in this District. The scheme and conspiracy have been directed at, and have had the intended effect of causing injury to, persons residing in, located in, or doing business throughout the United States, including in this District. The Clayton Act, 15 U.S.C. § 22, moreover, provides for nationwide service of process, giving this Court personal jurisdiction over Defendants based on their extensive contacts with the United States.

13.      Certain Defendants have each entered into an unlawful combination, contract, and/or conspiracy with Mowi USA, LLC, a Florida limited liability company that maintains its

principal place of business in this District, at 8550 N.W. 17th Street, No. 105, Miami, Florida 33126, and is thus subject to general jurisdiction in this Court. By entering into an unlawful conspiracy—the basis for Plaintiff's claims—with a company in this District, Defendants have transacted business in and availed themselves of the laws of Florida. The Court therefore has personal jurisdiction over each Defendant.

## THE PARTIES

### I.  *Plaintiff*

14.    Plaintiff Hesh's Seafood, Inc. is a Pennsylvania corporation that specializes in the distribution of fresh and frozen seafood to restaurants and other fine establishments locally, nationally, and internationally.  Plaintiff is headquartered at 1428 Ford Rd, Unit C, Bensalem, Pennsylvania 19020.  As a result of Defendants' collusive and anticompetitive conduct, Plaintiff purchased farm-raised salmon and/or products derived therefrom directly from one or more of the Defendants at artificially high or fixed prices and suffered monetary losses.

### II.  *Defendants*

*The Mowi Defendants*

15.    Defendant Mowi ASA, f/k/a Marine Harvest ASA ("Mowi ASA"), is a Norwegian seafood company with its principal place of business at Sandviksboder, 77 AB, 5035, Bergen, Norway.  Mowi ASA, both directly and/or through its subsidiaries, is the world's largest producer of farm-raised salmon, fulfilling one-fifth of global demand for farm-raised salmon.  Mowi ASA produces, processes, and sells farm-raised salmon internationally, with large operations in countries including Norway, Scotland, and Canada.  Mowi ASA is listed on the Oslo Stock Exchange ("OSE"), it is a constituent of the benchmark OBX Index, and its shares also trade on the U.S. over-the-counter ("OTC") Market.  Mowi ASA also uses some of its well-recognized

brands, such as Rebel Fish and Ducktrap River of Maine, to sell its farm-raised salmon products throughout the world, including in the United States.

16.    Defendant Mowi USA, LLC, f/k/a Marine Harvest USA, LLC ("Mowi USA"), is a Florida limited liability company with its principal place of business at 8550 N.W. 17th Street, Unit #105, Miami, Florida 33126.  Mowi USA is a wholly-owned subsidiary of Mowi ASA.  Mowi USA, either directly or through subsidiaries, receives fresh farm-raised salmon daily from Norway, Canada, Chile, and other fish farms around the world at its Miami and Dallas locations, processes the seafood at its 100,000 square foot headquarters facility in Medley, Florida and at its Arlington, Texas facility, and distributes it to wholesalers, retailers, and others in Florida and across the country.

17.    Defendant Mowi Ducktrap, LLC, a/k/a Ducktrap River of Maine, LLC ("Mowi Ducktrap"), is a Maine limited liability company with its principal place of business at 57 Little River Drive, Belfast, Maine 04915.  Mowi Ducktrap is a wholly-owned subsidiary of Mowi ASA, and it receives the majority of its farm-raised salmon from Mowi ASA-owned farms in Scotland, Norway, Iceland, and Chile.  Mowi Ducktrap processes the farm-raised salmon, through brining and/or smoking, and sells the farm-raised salmon through a variety of trade names such as Kendall Brook, Spruce Point, Winter Harbor, Ducktrap River, and Ducktrap River of Maine.

18.    Defendants Mowi ASA, Mowi USA, and Mowi Ducktrap are collectively referred to as "Mowi" or the "Mowi Defendants."

*The Grieg Defendants*

19.    Defendant Grieg Seafood ASA ("Grieg ASA") is an international seafood company with its principal place of business at C. Sundtsgate 17/19, 5004, Bergen, Norway.  Grieg ASA, directly and/or through its subsidiaries, specializes in farming salmon, with fish farms in Norway,

the UK, and Canada.  Grieg ASA is listed on the OSE.  Grieg ASA is the parent company of a group of companies engaged in the production and sale of seafood and related activities.

20.     Grieg ASA and Defendant Bremnes Seashore AS established and jointly own Defendant Ocean Quality AS, with Grieg ASA holding a 60 percent ownership interest and Bremnes Seashore ASA holding a 40 percent ownership interest.  Directly through Ocean Quality AS and/or through its subsidiaries, Grieg ASA, directly and/or through its subsidiaries, sells and distributes its farm-raised salmon throughout the United States.

21.     Defendant Grieg Seafood BC Ltd. ("Grieg BC") is a foreign corporation with its principal place of business at 1180 Ironwood Street, Unit #106, Campbell River, British Columbia, VPW 597 Canada.  Grieg BC is a wholly-owned subsidiary of Grieg ASA.  Grieg BC farms salmon throughout its fish farms and land-based hatchery in Canada.  Grieg BC sells its farm-raised salmon throughout the United States, in part using the Skuna Bay Salmon brand, which it describes as "a premium salmon product for fine dining restaurants in North America."

22.     According to Grieg ASA, Skuna Bay Salmon was "launched in November of 2011 in the US Southwest" and has "been served at more than 2,500 high-end restaurants and boutique retailers across more than 35 states and major urban markets including Los Angeles and New York, among many others."  Moreover, according to Grieg ASA, "[w]ell-known chefs from across America advocate for the [Skuna Bay Salmon] brand."

23.     Defendants Grieg ASA and Grieg BC are collectively referred to as "Grieg" or the "Grieg Defendants."

*Defendant Bremnes Seashore*

24.     Defendant Bremnes Seashore AS ("Bremnes Seashore") is a foreign corporation with its principal place of business at Oklandsvegen 90, N-5430 Bremnes, Norway.  Bremnes

Seashore is a seafood company that, directly and/or through its subsidiaries, focuses on salmon farming and has farms throughout Norway. Bremnes Seashore owns 40% of Defendant Ocean Quality AS and uses it to, directly and/or through its subsidiaries, sell and distribute its farm-raised salmon internationally, including throughout the United States.

25.     Bremnes Seashore explains: "We supply salmon around the globe through our sales companies Salmon Brands and Ocean Quality." Bremnes Seashore also has unique slaughter and packing plants which allows it to perform slaughter and packing services on behalf of salmon farming firms Bolaks, Austevoll Melaks, and Fremskridt.

*The Ocean Quality Defendants*

26.     Defendant Ocean Quality AS ("Ocean Quality AS") is a foreign corporation with its principal place of business at Grieg-Gaarden, C. Sundtsgate 17/19, N-5004, Bergen, Norway. Ocean Quality AS, directly and/or through its subsidiaries, sells seafood, including farm-raised salmon, throughout the world. Bremnes Seashore owns 40% of the shares of Ocean Quality AS, and Grieg ASA owns 60% of Ocean Quality AS and controls its operations. Grieg ASA explains that "[Ocean Quality AS] sells the fish to Asia, Europe, the USA and Canada."

27.     Defendant Ocean Quality North America, Inc. ("Ocean Quality NA") is a foreign corporation with its principal place of business at 4445 Lougheed Highway, 500, Burnaby, BC V5C0E4, Canada. Ocean Quality NA is a wholly-owned subsidiary of Ocean Quality AS. Ocean Quality NA provides sales and marketing services for global farm-raised salmon producers, including assisting with the sale and transportation of farm-raised salmon produced by Grieg Seafood ASA and Bremnes Seashore throughout the United States.

28.     Indeed, Ocean Quality NA has explained that it "is responsible for moving approx[imately] 40 million pounds of fresh farmed Atlantic salmon for its main supplier/partner

Grieg Seafood, B.C., a major farmed salmon producer in a growing worldwide industry." Ocean Quality NA has also explained that it is "one of North America's leading providers of farmed salmon to the marketplace . . . [and] is charged with elevating sales performance and expertise in serving more than 450 customers throughout the US, Canada, and Asia." Ocean Quality NA has a dedicated sales office in the United States.

29.     Defendant Ocean Quality USA, Inc. ("Ocean Quality USA") is a Delaware corporation with its principal place of business at 1914 Skillman Street, Unit #110-309, Dallas, Texas 75206. Ocean Quality USA is a wholly-owned subsidiary of Ocean Quality AS. Ocean Quality USA distributes farm-raised salmon produced by Grieg ASA, its subsidiaries, and Bremnes Seashore throughout the United States.

30.     Defendant Ocean Quality Premium Brands, Inc. ("Ocean Quality Premium") is a Delaware corporation with its principal place of business at 4445 Lougheed Highway, 500, Burnaby, BC V5C0E4, Canada. Ocean Quality Premium is a wholly-owned subsidiary of Ocean Quality AS. Ocean Quality Premium specializes in the sale and distribution of farm-raised salmon produced by Grieg ASA, its subsidiaries, and Bremnes Seashore throughout the United States.

31.     Defendants Ocean Quality AS, Ocean Quality NA, Ocean Quality USA, and Ocean Quality Premium are collectively referred to as "Ocean Quality" or the "Ocean Quality Defendants."

*Defendant SalMar*

32.     Defendant SalMar ASA ("SalMar") is a foreign corporation with its principal place of business at Idustriveien 51, N-7266, Kverva, Norway. SalMar, directly and/or through its subsidiaries, is one of the world's largest producers of farm-raised salmon. SalMar is listed on the OSE.

33.     SalMar explains that it has "established a fully integrated system for farming, processing, sales, and distribution of farmed salmon and is thus in control of the total value chain." SalMar further represents that the farm-raised salmon it produces "is sold through an in-house salesforce and/or through close partners."   Moreover, SalMar's "customer base is global and includes small and large importerts/exporters [sic] as well as larger processing companies and retail chains."   SalMar claims that it sells directly to the United States and that "North America has been the third largest market, with the USA as the largest individual market."   "SalMar experienced particularly strong growth in the American market in 2017."

34.     In 2001, SalMar and the Leroy Seafood Group ASA established salmon farm-raising operations outside of Norway through their joint venture in Norskott Havbruk AS, with SalMar having a 50% ownership interest.  In turn, Norskott Havbruk AS holds a 100% ownership interest in Scottish Sea Farms Ltd.  SalMar also has a 41.95% ownership interest in Arnarlax EHF, an Icelandic aquaculture company.

*The Leroy Defendants*

35.     Defendant Leroy Seafood Group ASA ("Leroy ASA") is a foreign corporation with its principal place of business at Thormohlens gate 51B, 5006 Bergen, Norway.  Leroy ASA is a self-described "world-leading" seafood corporation.  Its core business is "the production of salmon and trout, catches of whitefish, processing, product development, marketing, sale, and distribution of seafood. . . . [to] more than 80 different countries."  Leroy ASA has fish farms in Norway, other parts of Europe, and Turkey.  Leroy ASA also has sales offices in the United States.  Leroy ASA is listed on the OSE.

36.     Defendant Leroy Seafood USA, Inc., f/k/a Hallvard Leroy USA, Inc. ("Leroy USA"), is a North Carolina corporation with its principal place of business at 1289 Fordham Blvd.,

Suite 406, Chapel Hill, NC 27514.  Leroy USA is a wholly-owned subsidiary of Leroy ASA. Leroy USA distributes the farm-raised salmon produced by Leroy ASA and its subsidiaries.

37.     Defendants Leroy ASA and Leroy USA are collectively referred to as "Leroy" or the "Leroy Defendants."

*Defendant Scottish Sea Farms*

38.     Defendant Scottish Sea Farms Ltd. ("Scottish Sea Farms") is a foreign corporation with its principal place of business at Laurel House, Laurelhill Business Park, Stirling, FK7 9JQ, United Kingdom, 01786 44552.  Scottish Sea Farms is a seafood company that engages in the farming, processing, and production of farm-raised salmon.  Scottish Sea Farms is the United Kingdom's second largest producer of farm-raised salmon, selling its salmon throughout the world, including in the United States.

39.     As discussed above, Norskott Havbruk AS holds a 100% ownership interest in Scottish Sea Farms; in turn, Norskott Havbruk is jointly owned, with SalMar and Leroy each holding a 50% ownership interest.

40.     All of Defendants' actions described in this Complaint are part of, and in furtherance of, the unlawful conduct alleged in this Complaint. These actions were authorized, ordered, or undertaken by Defendants' various officers, agents, employees, or other representatives while engaged in the management of Defendants' affairs (or those of their predecessors-in-interest) within the course and scope of their duties and employment or with the actual, apparent, and/or ostensible authority of Defendants.

41.     Various persons and/or firms not named as Defendants in this Complaint may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

### <u>FACTUAL ALLEGATIONS</u>

**A.      The Cycle of Farm Raised Salmon**

42.      Farm-raised salmon are born, raised, and harvested under controlled conditions.

Mowi illustrated the process as follows:



# The Atlantic salmon life/production cycle



Source: Marine Harvest

43.      Specifically, the process begins with the selection of the parent salmon from the

broodstock cages. Over the next two months, eggs from the female or "hen" fish are fertilized

with milt from the male fish.  The fertilized eggs are then incubated in egg trays in freshwater

hatcheries.

44.      For the next several months, the eggs hatch and the baby salmon or alevins

emerge.  Alevins carry large, orange-colored yolk sacs, which contain all the nutrients they need.

45.     The fish become fry—fish that are capable of feeding themselves—when they have absorbed their yolk sac.  Fry are then transferred from the egg trays to tanks where they feed for themselves.  Fry remain in a freshwater hatchery for about four months, during which time they grow and become parr—juvenile fish that feed on small invertebrates and are camouflaged with a pattern of spots and vertical bars.

46.     The parr grow quickly and can double their weight in a month.  The parr then change, taking on a silvery blue color and streamlined shape as they turn into smolts.

47.     Smolts are young salmon which have already spent between 10 to 16 months in freshwater and are now ready to migrate to a marine environment where they will fully mature.

48.     Once in sea water, smolts continue their development until they become adult salmon.  This stage takes between 14 and 24 months.  During this time, salmon evolve, and their color becomes silver.

49.     Farm-raised salmon cannot be harvested before a buyer has been identified.  Because of the two- to three-year production cycle, harvestable fish must be sold before the next generation of fish can be introduced into the floating net pens.  This means that a fixed volume of farm-raised salmon must be moved into the market within a short period of time.

**B.      The Farm-Raised Salmon Market**

50.     Since the 1970s, farm-raised salmon industries around the globe have grown exponentially.  Today, the world's salmon farmers produce 2.5 million tons of salmon annually.  Global salmon farmers produce 17.5 billion meals every year.

51.     Consumers of salmon will probably find themselves buying a product from Norway, the world's leading producer of farm-raised Atlantic salmon.

52.     Atlantic salmon—the most popular farm-raised salmon variety—are mostly harvested offshore in Norway, Chile, Canada, and Scotland.  The volume of farm-raised Atlantic salmon increased almost 1,000 percent between 1990 and 2015.

53.     Although Canada is a significant producer of farm-raised Atlantic salmon in North America, Canadian supply is restricted by environmental regulations and limited acceptable farm sites.

54.     Likewise, United States producers are not significant market participants due to environmental regulations and limited acceptable farm sites.  In the United States, farm-raised Atlantic salmon are only produced in a couple of states and on a relatively small scale.

55.     Salmon farming in Chile also does not significantly impact supply of farm-raised Atlantic salmon.  Due to different climatic and sea conditions, Chilean farm-raised Atlantic salmon does not have the same taste profile and quality as Atlantic salmon that is farm-raised in the Northern Hemisphere.  Furthermore, due to the limited growing season, Chilean farm-raised salmon are often smaller than their North Atlantic counterparts.  Since Chilean farm-raised salmon is of lower quality and transportation costs are high, most of the Chilean imports into the United States are sold as fillets rather than whole fresh gutted Atlantic salmon.

## C.     Changes in Cost Cannot Justify the Increased Farm-Raised Salmon Prices

56.     In a market free of collusion, if costs for a good increase, prices will increase as higher costs will put upwards pressure on prices.  Economic models can test this relationship between costs and prices.  The purpose of using an econometrics model in antitrust analysis is to isolate from the anticompetitive conduct factors that may influence prices due to normal industry and business cycle reasons.

57.     Feed costs are the most important cost component in aquaculture, representing over 50 percent of the total costs in aquaculture.  Of that amount, feed proteins account for over

50 percent of the costs of feed.  Absent an unlawful conspiracy, contract, or combination, one would expect a strong positive relationship between the cost of feed protein (as represented by fishmeal) and farm-raised salmon prices.

58.     Economic analyses indicate that from 2009 through mid-2015, there was a strong relationship between the cost of feed protein (represented by the prices of fishmeal) and farm-raised salmon prices.  From July 2015 onwards, farm-raised salmon prices increased sharply while fishmeal prices remained flat or even decreased at times, as is evidenced below:





59.     As illustrated above, one regression analysis compared the relationship between the spot prices of farm-raised salmon reflected in the Nasdaq Salmon Index ("NQSALMON") with the price of fishmeal.  The second regression analysis tested whether there was a separate relationship between price and costs during the proposed Class period that was different from the relationship during the period preceding the proposed Class period.  The results from these regression analyses indicate that farm-raised salmon prices were higher than what changes in costs would show.  Moreover, these regression analyses indicate that during the proposed Class period, there was an inverse relationship between farm-raised salmon prices and fishmeal prices, *i.e.*, as fishmeal prices declined, farm-raised salmon prices increased.  These data points are

concrete evidence that farm-raised salmon prices were not increasing as a response to costs and, instead, were being affected by Defendants' combination, contract, and/or conspiracy.

**D.      Forward Prices Underestimate Spot Market Prices During the Proposed Class Period**

60.      Nasdaq Clearing AB constructed the NQSALMON to create an index that reflects the weekly market spot price for fresh Atlantic superior salmon, head on gutted ("HOG"). The NQSALMON is calculated based on actual physical transactions reported to Nasdaq Commodities by a panel of Norwegian salmon exporters and salmon producers with export licenses. The sales prices and volumes reported by the panel of exporters are representative of the total sales and volumes of exports out of Norway.

61.      An illustration of the NASDAQ price index from 2010 to 2019 is provided below:



62.     Forward prices of commodities are unbiased predictors of spot prices of the same commodities.  If forward prices consistently over or underestimate spot prices, they can be used to arbitrage market prices, which would violate the law of one price.  When data shows that forward prices underestimate spot prices, that can serve as evidence that spot prices are being manipulated and moved higher than competitive market conditions would otherwise predict.

63.     The farm-raised salmon market during the proposed Class period exhibits these characteristics.   During the beginning of the proposed Class period, forward prices underpredicted farm-raised salmon spot prices, in a way that is consistent with the farm-raised spot price market being manipulated.

64.     The figures below illustrate the relationship between farm-raised salmon's monthly spot prices and the forward prices for the same month.  During the beginning of the proposed Class period, forward prices consistently underpredicted spot prices of farm-raised salmon.









Comparison of Fishpool Monthly Spot Prices with 12 Month Forward Prices

65.    A comparison of the spread between farm-raised salmon's spot prices and forward prices also indicates that forward prices were not behaving as unbiased predictors of spot prices during the beginning of the proposed Class period.  As the figures below illustrate, the "spread"—defined as the difference between the spot price and the forward price—was consistently greater than zero during the start of the proposed Class period, indicating that market participants' price expectations consistently underestimated actual spot prices of farm-raised salmon.







66.     As illustrated in the regression analyses above, because the spread increased during the conspiracy period, forward prices were performing worse as predictors of spot prices. In other words, the regression analyses of the spread support the conclusion that an unlawful contract, conspiracy, and/or combination existed.

67.     Consistent with the above findings, those in the farm-raised salmon industry have also noticed issues with the spot market.  Since 2015, salmon buyers in Europe have suspected that Norway's salmon producers, including Mowi, have been rigging the spot market by using subsidiary companies, including Mowi's Polish subsidiary Morpol, a fish processor and distributor, to drive up the spot price.  As the purchasing director of Polish salmon processor Graal, S.A. ("Graal") Alina Piasecka, explained, "We've seen examples of prices falling in the spot market, and exporters offering fish at increasingly lower prices."  She continued, "Suddenly, 15

23

minutes later there are [sic] aren't fish available, and we find out that Morpol has purchased perhaps 60 truckloads."

68.     Graal's CEO Boguslaw Kowalski has said: "[Morpol is] misusing their market position to hike up salmon prices. . . We are seeing that now and again [Mowi] take[s] advantage of Morpol to buy at higher prices than that charged by the market, to hike up prices."

69.     In 2017, Stale Hoyem, general manager of Suempol Norway, one of the biggest smoked salmon producers in Poland and Europe, complained that "companies in Norway buy small quantities of salmon to raise the price for the rest of the players."  Hoyem continued, "One last thing that affects prices is that some of the major players choose to create their own purchasing departments buying a truckload here and a truckload there," he said, "suggesting this 'daily' practice is heavily influencing prices on the spot market."

70.     Borge Prytz Larsen, purchasing director at Severnaya, an importer of farm-raised salmon into Russia, confirmed Hoyem's statement: "The big players buy fish, and they then use the price as indicators for other customers."

71.     Defendants' pricing behavior changed at the start of the Class period. Hoyem complained: "In the old days we could negotiate contracts.  Producers looked at their cost and then they put on a surcharge of about NOK 1 (€0.11/$.13) to NOK 2 (€0.21/$.25) [per kilo]."

**E.     As a Result of the Conspiracy, Defendants' and their Co-Conspirators' Prices and Profits For Salmon Have Been Increasing Steadily Since at Least 2015**

72.     The Food and Agriculture Organization of the United Nations took note of the record prices in the salmon sector, observing that 2016 saw "[s]everely elevated prices," and that "[g]rowth in export revenue for the Norwegian farmed Atlantic salmon industry over the last three years has been truly remarkable."

24

73.     More specifically, the United Nations market report stated: "Even as total Norwegian export volume declined in 2016, total export value broke the all-time record, while the average export price for fresh whole salmon was NKr60.1 (US$7.15) per kg for the year, representing a 40 percent increase compared with 2015.  In these conditions, even rapidly rising production costs associated with feed and sea lice control have not prevented Norwegian salmon aquaculture companies from realizing record earnings."

74.     By 2018, prices for Norwegian salmon surged to record levels.  Export prices for Norwegian farmed Atlantic salmon reached a peak of NOK 80 per kg in mid-2018.  According to Statistics Norway, Norwegian salmon prices doubled from 2017 to 2018.



75.     A 2019 industry presentation by Kairos Commodities on price analysis and forecasts for farm-raised salmon discussed its developed regression model to measure the "fair value" of farm-raised salmon and found that salmon prices during the Class period vastly exceeded the "fair value" estimation:



76.     Defendants frequently—and falsely—assert that cost increases justify their price increases, but their own data disproves that purported justification.  For example, the following chart from Mowi indicates that the "cost in box" of producing salmon (per kilogram) has increased approximately half of one Euro (or less) during the Class period, but prices have increased at a substantially faster rate:



77.     Mowi's 2017 Annual Report confirms that since the uptick in salmon pricing beginning in 2015, its *operating profits* or "operational EBIT" (reported in Euros) has substantially increased—from 346.8 million Euros in 2015, to 700.2 million Euros in 2016, to 792.1 million Euros in 2017.

78.     According to CEO Alf-Helge Aarskog, in Mowi's fourth quarter 2018 financial disclosures:

> 2018 was a very good year for Mowi.  Strong demand for salmon and high prices in all markets resulted in great earnings for the company.  I am proud of all my colleagues who work hard to produce healthy and tasty seafood for consumers all over the world. They have all contributed to the strong results.

79.     Grieg similarly reported that its EBIT per kg gutted weight of fish (in Norwegian Kroner) has increased during the course of the contract, combination, and/or conspiracy. According to Grieg's 2017 Annual Report, EBIT was 0.7 Kroners/kg in 2015, 18.0 Kroners/kg in 2016, and 14.4 Kroners/kg in 2017.  In 2018, Grieg's EBIT was 14.72 Kroners/kg.

80.     Leroy also experienced substantial increases in EBIT (in Norwegian Kroner), increasing from 8.8 Kroners/kg in 2015 to 18.9 Kroners/kg in 2016, and 23.6 Kroners/kg in 2017. In 2018, Leroy's EBIT was 19.6 Kroners/kg.

81.     Similarly, SalMar's EBIT has increased substantially.  In 2015, its EBIT was 1,404 million Norwegian Kroners.  In 2016, its EBIT was 2,432 million Kroners.  In 2017, its EBIT was 3,162 million Kroners.  In 2018, its EBIT rose to 3,460.8 million Kroners.

82.     These price increases and/or artificially fixed, stable, or maintained prices—and Defendants' and their co-conspirators' coordinated behavior that caused them—have harmed Plaintiff and Class members who have paid more for farm-raised salmon and products derived therefrom than Plaintiff and Class members otherwise would have in the absence of collusion.

### F.  The United States Is The Second Largest Global Market For Salmon

83.  Mowi reports that after the European Union ("EU"), the United States is the second largest global market for salmon.

## Global volume by market

| Markets | Estimated volumes Q4 2018 | Q4 2017 | Compared to Q4 2017 Volume | % | Est. volumes Q3 2018 | 12 month comparison LTM | PTM | % |
|---|---|---|---|---|---|---|---|---|
| EU | 274 900 | 268 100 | 6 800 ⬆ 2.5% | | 247 600 | 955 700 | 921 200 | 3.7% |
| Russia | 24 300 | 23 200 | 1 100 ⬆ 4.7% | | 22 000 | 87 200 | 69 800 | 24.9% |
| Other Europe | 22 900 | 24 500 | -1 600 ⬇ -6.5% | | 20 200 | 81 900 | 79 500 | 3.0% |
| **Total Europe** | **322 100** | **315 800** | **6 300 ⬆ 2.0%** | | **289 800** | **1 124 800** | **1 070 600** | **5.1%** |
| USA | 107 700 | 103 000 | 4 700 ⬆ 4.6% | | 102 200 | 427 900 | 397 700 | 7.6% |
| Brazil | 24 000 | 21 800 | 2 200 ⬆ 10.1% | | 21 600 | 89 400 | 79 900 | 11.9% |
| Other Americas | 38 600 | 31 000 | 7 600 ⬆ 24.5% | | 29 500 | 122 700 | 108 300 | 13.3% |
| **Total Americas** | **170 300** | **155 800** | **14 500 ⬆ 9.3%** | | **153 300** | **640 000** | **585 900** | **9.2%** |
| China / Hong Kong | 25 800 | 27 300 | -1 500 ⬇ -5.5% | | 24 700 | 101 700 | 86 000 | 18.3% |
| Japan | 16 300 | 15 900 | 400 ⬆ 2.5% | | 12 800 | 53 900 | 57 700 | -6.6% |
| South Korea / Taiwan | 15 600 | 12 100 | 3 500 ⬆ 28.9% | | 12 700 | 56 000 | 45 500 | 23.1% |
| Other Asia | 22 200 | 21 400 | 800 ⬆ 3.7% | | 15 100 | 73 100 | 83 500 | -12.5% |
| **Total Asia** | **79 900** | **76 700** | **3 200 ⬆ 4.2%** | | **65 300** | **284 700** | **272 700** | **4.4%** |
| All other markets | 32 900 | 30 400 | 2 500 ⬆ 8.2% | | 29 400 | 116 000 | 108 800 | 6.6% |
| **Total** | **605 200** | **578 700** | **26 500 ⬆ 4.6%** | | **537 800** | **2 165 500** | **2 037 700** | **6.3%** |
| Inflow to US from Europe | 25 700 | 25 100 | 600 ⬆ 2.4% | | 22 000 | 93 800 | 95 300 | -1.6% |
| Inflow to EU from Chile | 8 400 | 12 200 | -3 800 ⬇ -31.1% | | 7 600 | 37 700 | 38 300 | -1.6% |

Source: Kontali

- Strong demand globally
- Europe: Increased consumption at higher prices
- US: Convenient and consumer friendly pre-packed products drive growth
- Asia: Increased consumption. Lack of available large sized fish and certain trade restrictions temporarily impacted consumption in China/Hong Kong

Page 26   Source: Kontali
Note: Atlantic Salmon (GWT). LTM: Last Twelve Months, PTM: Previous Twelve Months"

MOWI

84.  A December 12, 2018 article from industry publication *Intrafish* explained:

Salmon import volumes into the United States through October rose 10.5 percent, reaching 272,676 metric tons, according to new figures released by the National Marine Fisheries Service (NMFS).

The value of Atlantic salmon imports rose as well, by 9.5 percent, to reach $2.9 billion (€2.6 billion), up from $2.6 billion (€2.3 billion) during the same period last year.

### G.  The EC is Performing an Open and Active Investigation of Defendants

85.  On February 19, 2019, *Undercurrent News* reported that in early February the EC opened an antitrust investigation into the world's major producers of farm-raised salmon:

According to the letter, the EC has "received information -- from different actors operating at different levels in the salmon market -- alleging that Norwegian producers of farmed Atlantic salmon . . . participate or have participated in anti-competitive agreements and/or concerted practices related to different ways of price

28

coordination in order to sustain and possibly increase the prices for Norwegian salmon."

86. The EC's letter, which was sent to producers at the start of February, stated that the Norwegian salmon producers under investigation have been allegedly:

- Coordinating sales prices and exchanging commercially sensitive information;

- Agreeing to purchase production from other competitors when these other competitors sell at lower prices; and

- Applying a coordinated strategy to increase spot prices of farmed Norwegian salmon in order to secure higher price levels for long-term contracts.

87. Based on the information provided to the EC, these alleged practices "are presumably ongoing."

88. The EC also released the following statement on February 19, 2019:

The European Commission can confirm that on 19 February 2019 its officials carried out unannounced inspections in several Member States at the premises of several companies in the sector of farmed Atlantic salmon.

The Commission has concerns that the inspected companies may have violated EU antitrust rules that prohibit cartels and restrictive business practices (Article 101 of the Treaty on the Functioning of the European Union). The Commission officials were accompanied by their counterparts from the relevant national competition authorities.

89. Mowi, Grieg, SalMar, and Leroy have all confirmed that they were the subject of raids at their facilities by the EC:

*Undercurrent* first reported the news earlier on Tuesday, then Mowi, Grieg Seafood and SalMar all confirmed raids on their operations in the UK. Mowi's spokesman said the company's plant in Rosyth, UK, was raided, but then also confirmed a plant in Lemmers, formerly Marine Harvest Sterk, was inspected.

90. In a recently released annual report for 2018, Mowi disclosed:

In February 2019, The European Commission carried out unannounced inspections at selected premises of several Norwegian salmon companies, including Mowi. The

Commission was acting on concerns that the inspected companies may have violated EU antitrust rules.

91.    On February 19, 2019, Grieg filed a notice with the OSE stating:

The European Commission DG (Director General) Competition has today performed an inspection at Grieg Seafood Shetland to explore potential anti-competitive behavior in the salmon industry.

Grieg Seafood aims to be open, transparent and forthcoming and will provide all necessary information requested by the European Commission DG Competition in its investigation.

92.    SalMar also confirmed its UK joint venture Scottish Sea Farms ("SSF"), which is co-owned with Leroy Seafood ASA, "ha[d] been inspected" as part of an EC probe of alleged price-fixing in the sector in "several" member states.

93.    Also, on February 19, 2019, SalMar issued the following report to the OSE relating to an inspection performed at Scottish Sea Farms:

On 19th of February 2019 the European Commission Director General Competition performed an inspection at Scottish Sea Farms Ltd., in which SalMar ASA indirectly owns 50 percent.   SalMar is in constructive dialogue with the Commission in this regard.

94.    On February 20, 2019, Leroy filed a notice with the OSE confirming the inspections and stating:

EU's competition authorities (European Commission Director General Competition) has conducted an inspection at the premises of Scottish Sea Farms Ltd. a company owned 50% by Lerøy Seafood Group ASA (LSG).  The purpose is, according to the competition authorities, to investigate accusations of anti-competitive cooperation in the salmon market. In connection with the inspection, the EU competition authorities has also requested for information from the shareholders in Scottish Sea Farms Ltd.

## H.    The Farm-Raised Salmon Market's Characteristics Are Conducive to Collusion

95.    The farm-raised salmon market is tailor-made for unlawful but successful contracts, conspiracies, and/or combinations.  The farm-raised salmon market is highly concentrated and well-protected by high barriers to entry, farm-raised salmon products are commodities with

demand inelastic to price, and the farm-raised salmon market is rife with opportunities for Defendants and their co-conspirators to collude.

        1.    <u>The Farm-Raised Salmon Market Is Highly Concentrated.</u>

96.    A highly-concentrated market is more susceptible to collusion and other anticompetitive practices than less concentrated markets.

97.    Defendants together account for most of the farm-raised salmon sold both globally and in the United States.

98.    Here, there has been significant (and rapid) consolidation of salmon farming operations around the globe in recent years.  As Mowi reported:



The graph shows the number of players producing 80% of the farmed salmon and trout in each major producing country.

During the last decade the salmon farming industry has been through a period of consolidation in all regions and this is expected to continue.

Historically, the salmon industry has been made up by many small firms. As illustrated above, this has been the case in Norway, and to some degree in Scotland and Chile.

## 06 Industry Structure

### 6.1 Top 5-10 players of farmed Atlantic salmon

| | Top 10 - Norway | H.Q. | Top 5 - United Kingdom | H.Q. | Top 5 - North America | H.Q. | Top 10 - Chile | H.Q. |
|---|---|---|---|---|---|---|---|---|
| 1 | Marine Harvest | 210 200 | Marine Harvest | 60 200 | Cooke Aquaculture | 57 000 | Salmones Multiexport | 58 700 |
| 2 | Salmar | 135 200 | Scottish Seafarms | 31 000 | Cermaq** | 39 400 | Cermaq** | 54 000 |
| 3 | Lerøy Seafood | 132 000 | The Scottish Salmon Co. | 25 300 | Cermaq** | 21 000 | Marine Harvest | 44 900 |
| 4 | Cermaq** | 48 000 | Cooke Aquaculture | 20 000 | Northern Harvest | 12 500 | Empresas Aquachile | 43 300 |
| 5 | Grieg Seafood | 40 900 | Grieg Seafood | 12 100 | Grieg Seafood | 9 600 | Pesquera Los Fiordos | 41 000 |
| 6 | Nova Sea | 40 700 | | | | | Australis Seafood | 39 100 |
| 7 | Nordlaks | 40 000 | | | | | Camanchaca | 30 800 |
| 8 | Norway Royal Salmon | 31 900 | | | | | Blumar | 27 000 |
| 9 | Alsaker Fjordbruk | 25 000 | | | | | Nova Austral | 24 500 |
| 10 | Bremnes Seashore | 24 000 | | | | | Invermar | 23 200 |
| | Top 10 | 727 900 | Top 5 | 148 600 | Top 5 | 139 500 | Top 10 | 386 500 |
| | Total | 1 087 000 | Total | 156 900 | Total | 145 500 | Total | 521 200 |
| | Share of total | 67 % | Share of total | 95 % | Share of total | 96 % | Share of total | 74 % |

Note: All figures in tonnes GWT for 2017
\* UK and North American industry are best described by top 5 producers.
\*\* Cermaq is a fully owned subsidiary of Mitsubishi Corporation

The Marine Harvest Group represents the largest total production and produces around one fifth of the salmon produced in Norway, and about one third of the total produced in North America and the UK.

  2. <u>There Are High Barriers to Entry into the Farm-Raised Salmon Market</u>.

99. Under normal circumstances, prices above competitive levels attract new entrants into the market. Where there are significant barriers to entry, however, new competition is less likely. By keeping out entrants who would offer a product at lower prices, these barriers favor the formation and survival of conspiracies. Such is the case with the market for farm-raised salmon in the United States, where daunting barriers to entry have excluded prospective entrants despite the artificial fixing, stabilizing, and/or inflation of pricing.

100. Defendants themselves have acknowledged these barriers. Mowi has described some of the reasons for the barriers into market entry as follows: (1) There are few locations in the world that provide the right mix of oceanic conditions for salmon farming and a political environment to allow the practice; and (2) There is an inability to bring additional salmon supply online in a short period of time.

## 04    **Salmon Supply**

### 4.3 Few coastlines feasible for salmon farming



The main coastal areas adopted for salmon farming are depicted on the above map. The coastlines are within certain latitude bands on the Northern and Southern Hemisphere.

A key condition is a temperature range between above zero and 18-20ºC. The optimal temperature range for salmon is between 8 and 14ºC.

Salmon farming also requires a certain current to allow a flow of water through the farm. The current must however be below a certain level to allow the fish to move freely around in the sites. Such conditions are typically found in waters protected by archipelagos and fjords and rule out several coastlines.

Certain biological parameters are also required to allow efficient production. The biological conditions vary significantly within the adopted areas and are prohibitive for certain other areas.

Political willingness to permit salmon farming and to regulate the industry is also required. Licence systems have been adopted in all areas where salmon farming is carried out.

101.    Mowi further explained: "In all salmon producing regions, the relevant authorities have a licensing regime in place.  In order to operate a salmon farm, a license is the key prerequisite. The licenses constrain the maximum for each company and the industry as a whole."

102.    The relatively limited number of sites with conditions suitable for salmon farming and the regulatory burdens associated with these sites mean that operators of salmon farms have very limited opportunities to expand capacity.

103.    Consolidation has also resulted in higher efficiencies of scale that reduce costs, including, for example, volume purchases of feed stock, more efficient transportation, and computerized feeding technology that reduces labor inputs.

104.    Entry into the farm-raised salmon market demands costly start-up capital expenditures.  More importantly, because of the combination, contract, and/or conspiracy, new entrants have no ability to enter and differentiate themselves.

105.    These challenging barriers to entry helped facilitate the formation and maintenance of Defendants' and their co-conspirators' contracts, conspiracies, and/or combinations, safeguarding Defendants from competitive pressure.

      3.     <u>Farm-Raised Salmon Is A Commodity Product, And Prices Are Correlated Across the Globe.</u>

106.    Global commerce and transparency create a commodity price for farm-raised salmon that is closely tracked in numerous publicly available indices that are reported and easily accessible. A report issued in 2018 by the EU confirms this point: "The output of most salmonid aquaculture, and Atlantic salmon in particular, is highly commoditized, *i.e.*, there is little differentiation between farms and competition is based purely on price. These products, mostly head-on gutted fresh fish, serve as raw material for further processing. In that situation, large enterprises, which can reduce costs of production through economies of scale and offer the lowest

34

price, have a competitive advantage."  Commodity products are fungible, and consumers and other purchasers have a variety of supply options, all of which makes raising prices by any one supplier difficult in the absence of a conspiracy.

107.    Further, according to Grieg, salmon prices are linked across the globe, and Defendants, co-conspirators, and others closely follow these prices: "There are several reference prices for salmon available.  In Norway, Fish Pool ASA provides historic price information as well as salmon derivative prices FCA Oslo.  In the United States, Urner Barry provides reference prices for North American salmon in Seattle and Chilean salmon in Miami. Market prices are correlated across regions."

108.    Mowi also recognized that "price correlation across regional markets is generally strong for Atlantic salmon."  It further explained that arbitrage between regions is one of the factors constraining prices for Atlantic salmon.  Accordingly, price-fixing of salmon prices in one market will affect prices globally.

109.    In fact, Mowi reported that it tracks the correlation of salmon prices globally in the normal course of its business.

110.    This point was also recognized in a 2016 report—issued by the Oslo Fish Pool, a salmon financial contracts exchange, and DNB Foods & Seafood, which is part of Norway's largest financial services organization—titled "World market for salmon: pricing and currencies." The report pointed out that Norwegian farmed salmon gate prices are "strongly linked" and that the collusion by Defendants on those Norwegian prices directly affected prices for farmed salmon raised elsewhere pursuant to the "law of one price."

111.    Indeed, the 2016 report noted as follows:



112.     The 2016 report further elaborated on the economic principle of the "law of one

price" as it related to the farm-raised salmon market in the United States.

4.     Prices for Farm-Raised Salmon Are Inelastic.

113.     Price elasticity measures the responsiveness of demand to a change in price.  When

the seller of a product is able to increase prices without a significant drop in demand, pricing is

considered inelastic.  Price inelasticity makes a market more susceptible to collusive manipulation

by enabling all producers to raise prices with little fear of driving customers to substitute products.

114.     Accordingly, in the absence of coordinated conduct among producers, Defendants

and others in the farm-raised salmon market are price-takers.  They are unable to reduce supply in

the short term to raise prices unilaterally, and they must sell during a very short window while

their product is fit for human consumption. These market constraints make the farm-raised salmon

36

market more susceptible to collusion than markets where goods are not perishable and production levels can be rapidly modulated.

115.    Defendants have succeeded in steadily maintaining, fixing, stabilizing, and/or increasing farm-raised salmon prices despite transactional costs that have risen at a much slower rate overall.  In a free and competitive market, Defendants would be under enormous pressure to cut their prices.

               5.    <u>Defendants Had and Continue to Have Many Opportunities to Collude</u>.

116.    Defendants and their co-conspirators attended the same industry events, fostering opportunities to conspire. Such industry events have provided myriad opportunities to meet, conspire, and share information.

117.    Defendants also exchanged and continue to exchange price and production information and purchase farm-raised salmon from each other.

118.    Defendants' unlawful price-fixing practices have injured and continue to injure Plaintiff and Class members.  Plaintiff and Class members were and are denied the ability to buy less expensive farm-raised salmon—an injury that is ongoing.

## **CLASS ACTION ALLEGATIONS**

119.    Plaintiff brings this action on behalf of itself and as a class action under Rules 23(a), (b)(2), and/or (b)(3) on behalf of the following nationwide class of those similarly situated:

> All persons and entities in the United States who purchased farm-raised salmon and/or products derived therefrom directly from Defendants, or from any current or former subsidiary or affiliate of Defendants, or any co-conspirator, from at least July 1, 2015 to the present (the "Class").

120.    Excluded from the Class are Defendants and their parents, subsidiaries, corporate affiliates, officers, directors, employees, assigns, successors, and co-conspirators, the court, court staff, Defendants' counsel, and all respective immediate family members of the excluded entities

described above.  Plaintiff reserves the right to revise the definition of the Class based upon subsequently discovered information and reserves the right to add Sub-Classes where appropriate.

121.    Numerosity: The Class is so numerous that joinder of all members is impractical; in the United States, there are hundreds, or thousands of purchasers of Defendants' farm-raised salmon and/or products derived therefrom.  While the exact number and identities of the individual members of the Class are unknown at this time, such information being in the sole possession of Defendants and obtainable by Plaintiff only through the discovery process, Plaintiff believes, and on that basis alleges, that at least hundreds of Class members are the subjects of the Class.

122.    Existence and Predominance of Common Questions of Fact and Law: Common questions of fact and law exist as to all Class members.  These questions predominate over the questions affecting individual Class members.  These common legal and factual questions include, but are not limited to:

(a)      Whether Defendants and their co-conspirators orchestrated and engaged in unlawful contracts, combinations, and/or conspiracies in restraint of trade and commerce;

(b)      The identity of the participants of the alleged conspiracy;

(c)      The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the alleged conspiracy;

(d)      Whether Defendants and their co-conspirators violated the Sherman Antitrust Act, 15 U.S.C. § 1, *et seq.*;

(e)      The effect of the alleged conspiracy on the price of farm-raised salmon and products derived therefrom during the Class Period;

(f)      Whether Defendants and their co-conspirators fraudulently concealed the existence of their anticompetitive conduct from Plaintiff and Class members;

(g)     Whether Defendants should be required to disclose the existence of such agreements, contracts, combinations, and/or conspiracies;

(h)     Whether Plaintiff and Class members are entitled to damages, restitution, disgorgement, equitable relief, and/or other relief; and

(i)     The amount and nature of such relief to be awarded to Plaintiff and Class members.

123.    Typicality: All of Plaintiff's claims are typical of the claims of the Class inasmuch as Plaintiff was a purchaser who paid artificially-inflated prices for farm-raised salmon and/or products derived therefrom that were produced by Defendants and/or their co-conspirators, and each member of the Class was a purchaser of farm-raised salmon and/or products derived therefrom that were produced by Defendants and/or their co-conspirators subject to the same artificially-fixed and/or inflated prices.  Further, Plaintiff and Class members sustained the same monetary and economic injuries of being subjected to and having paid artificially-fixed and/or inflated prices, and the remedy sought for each is the same.

124.    Adequacy: Plaintiff is an adequate representative because Plaintiff's interests do not conflict with the interests of the Class that Plaintiff seeks to represent, Plaintiff has retained counsel competent and highly experienced in complex class action litigation, and Plaintiff and Plaintiff's counsel intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff and Plaintiff's counsel.

125.    Superiority: A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiff and Class members. The injuries suffered by each individual Class member are relatively small in comparison to the burden and expense of the individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct. It would be virtually impossible for members of the Class individually to redress

effectively the wrongs done to them. Even if Class members could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of a single adjudication, an economy of scale, and comprehensive supervision by a single court. Upon information and belief, Class members can be readily identified and notified based on, *inter alia*, Defendants' sales records and invoices and marketing distribution lists and records.

126.    Defendants have acted and refused to act on grounds generally applicable to the Class, thereby making appropriate final equitable relief with respect to the Class as a whole.

## **TRADE AND COMMERCE**

127.    During the Class Period, Defendants harvested, promoted, processed, distributed, and sold substantial amounts of farm-raised salmon and/or products derived therefrom in a continuous and uninterrupted flow of intrastate and interstate trade and commerce to customers located throughout the United States. These business activities, as well as substantial quantities of equipment and supplies necessary to conduct them, and the payments to Defendants have traveled in and substantially affected intrastate and interstate trade and commerce.

128.    Defendants' and their co-conspirators' anticompetitive conduct also had substantial intrastate effects in every state of purchase in that, among other things, retailers within each state were foreclosed from offering less-expensive farm-raised salmon, which directly impacted and disrupted commerce for consumers.

129.    Freed from external competition and agreeing amongst themselves that they would not compete over prices, Defendants charged fixed and/or inflated prices. These fixed and/or anticompetitive pricing practices increased prices paid by all for farm-raised salmon.

130.    But for Defendants' illegal conduct, Plaintiff and Class members would have paid less for farm-raised salmon. Defendants' conduct proximately caused Plaintiff's and Class members' injuries. It forced them to pay hundreds of millions of dollars in overcharges on purchases of farm-raised salmon and denied them the opportunity to save by purchasing salmon at lower prices from other competitors in the marketplace.

## ANTITRUST IMPACT

131.    Defendants' anticompetitive conduct enabled them to raise, fix, and stabilize prices to Plaintiff and the Class members in excess of the prices Defendants otherwise would have been able to charge, absent Defendants' anticompetitive conduct.

132.    The precise amount of the overcharge can be measured and quantified. Commonly used and well-accepted economic models can be used to measure the extent and the amount of the supra-competitive charge. Thus, the economic harm to Plaintiff and Class members can be quantified.

133.    Defendants' anticompetitive scheme has the purpose and effect of unreasonably restraining trade by eliminating competition between Defendants competing for buyers of farm-raised salmon. But for Defendants: (1) coordinating sales prices and exchanging commercially sensitive information; (2) agreeing to purchase production from other competitors when these other competitors sell at lower prices; and (3) applying a coordinated strategy to increase spot prices of farmed Norwegian salmon in order to secure higher price levels for long-term contracts, direct purchasers of farm-raised salmon and products derived therefrom would have been able to purchase the products at lower pricing.

## FRAUDULENT CONCEALMENT

134.    Throughout the Class Period, Defendants have affirmatively and fraudulently concealed their unlawful conduct. Plaintiff did not have actual, inquiry or constructive notice of

41

facts giving rise to their claims for relief until February 19, 2019, when it was publicly announced that the EC carried out inspections at Defendants' facilities. Before that date, Plaintiff and Class members did not discover and could not have discovered through the exercise of reasonable diligence, the existence of Defendants' and their co-conspirators' conspiracy to suppress competition in the relevant markets or the true nature and substance of the acts Defendants and their co-conspirators have engaged in to further their conspiracy. The nature of Defendants' and their co-conspirators' conspiracy was self-concealing.

135.   Not enough information about Defendants' and their co-conspirators' participation in a farm-raised salmon conspiracy was available in the public domain to Plaintiff and Class members prior to February 19, 2019, when a news publication noted that certain Atlantic salmon farming facilities had been raided by European competition authorities. Prior to that time, there was insufficient information to suggest that Defendants were involved in a conspiracy. For these reasons, the statute of limitations did not begin to run until at the earliest February 19, 2019, with respect to the claims that Plaintiff and Class members allege in this Complaint.

136.   Further, fraudulent concealment tolled the statute of limitations on the claims asserted herein by Plaintiff and the Class until at least February 19, 2019. Defendants affirmatively and wrongfully concealed their anticompetitive conduct from Plaintiff and Class members, from at least as early as July 2015 through at least February 19, 2019. During that time, Plaintiff and the Class did not learn or discover the operative facts giving rise to this Complaint.

137.   Defendants and their co-conspirators agreed to conceal and actively and purposefully did conceal their unlawful actions by secretly organizing, conducting, and enforcing their conspiracy by agreeing not to publicly disclose their scheme and by giving pretextual explanations and justifications for the price increases. Defendants' and their co-conspirators'

purported reasons for the pricing of farm-raised salmon were materially false and misleading and were made for the purpose of concealing their conspiracy and the actual reasons for fixed and/or inflated pricing of farm-raised salmon.

138.    Defendants suggested publicly that their pricing activities were unilateral, rather than based on anticompetitive agreements. In making those false representations, Defendants and their co-conspirators misled Plaintiff and Class members as to the true, collusive, and coordinated nature of their price-fixing activities.

139.    As a result of Defendants' and their co-conspirators' fraudulent concealment of their conspiracy, the running of all applicable statutes of limitations has been tolled with respect to any claims that Plaintiff and Class members have arising from Defendants' and their co-conspirators' unlawful conduct.

## CLAIM FOR RELIEF

### COUNT I: UNLAWFUL RESTRAINT OF COMPETITION
### IN VIOLATION OF THE SHERMAN ACT § 1, *et. seq*

140.    Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint and further alleges against Defendants and their co-conspirators as follows:

141.    Defendants and their co-conspirators orchestrated, entered into, and engaged in unlawful contracts, combinations in the form of trust or otherwise, and/or conspiracies in restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, *et seq*.

142.    The course, pattern, and practice of Defendants' and their co-conspirators' collusive conduct have included, among other things, a continuing agreement, understanding, conspiracy, and concert of action among them in unreasonable restraint of trade to impose and enforce fixed, increased, maintained, or stabilized prices in the farm-raised salmon market and

products derived therefrom.  In order to organize and effectuate their illegal combination, contract, and conspiracy, Defendants and their co-conspirators have engaged in a number of overtly collusive acts, including without limitation:

(a)     agreeing to exchange and exchanging competitively sensitive information among themselves that would normally be withheld from competitors in a competitive environment with the aim to fix, increase, maintain, or stabilize prices of farm-raised salmon and/or products derived therefrom in the United States and elsewhere;

(b)     agreeing to participate and participating in conversations and meetings among themselves to share information and agree to fix, increase, maintain, or stabilize prices of farm-raised salmon and/or products derived therefrom in the United States and elsewhere;

(c)     agreeing to participate and participating in conversations and meetings to share information, adopt common strategies, and coordinate actions with respect to their agreements and business relationships; and

(d)     agreeing to engage and engaging in conduct designed to fix, increase, maintain, or stabilize the prices of farm-raised salmon sold on the spot market and pursuant to contracts.

143.    Defendants' and their co-conspirators' conduct included concerted efforts, actions, and undertakings among Defendants and their co-conspirators with the intent, purpose, and effect of: (a) artificially fixing, increasing, maintaining, or stabilizing across the world, including specifically the United States, the prices of farm-raised salmon and products derived therefrom; (b) causing Plaintiff and Class members to suffer a loss in their purchase of farm-raised salmon and products derived therefrom at artificially fixed, increased, maintained, or stabilized prices and thereby also depressing future profits of Plaintiff and Class members using said salmon and

salmon-derived products; (c) deterring, restraining, suppressing, and/or eliminating price competition from entering and competing in the market of farm-raised salmon and products derived therefrom; and (d) unreasonably restraining purchasers' ability to secure farm-raised salmon and products derived therefrom at competitive prices.

144.     Defendants and their co-conspirators perpetrated the scheme with the specific intent of artificially fixing, increasing, maintaining, or stabilizing prices in the United States to the benefit of Defendants and their co-conspirators.

145.     Defendants' and their co-conspirators' conduct as part of and in furtherance of the contract, combination, or conspiracy was authorized, ordered, or executed by their officers, directors, agents, employees, or representatives while actively engaging in the management of Defendants' and their co-conspirators' affairs.

146.     Plaintiff and Class members have paid more for Defendants' and their co-conspirators' farm-raised salmon and products derived therefrom than they otherwise would have paid in the absence of Defendants' and their co-conspirators' unlawful conduct, and have as a result been injured in their property and suffered damages in an amount according to proof at trial.

147.     Defendants' and their co-conspirators' conduct, contracts, combinations, and/or conspiracies are *per se* violations of § 1 of the Sherman Act.

148.     In the alternative, Defendants and their co-conspirators are liable under a "quick look" analysis where an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on purchasers and the market.

149.     Defendants' and their co-conspirators' contracts, conspiracies, and/or combinations have had a substantial effect on interstate commerce.

150.     As a direct and proximate result of Defendants' and their co-conspirators' unlawful contracts, conspiracies, and/or combinations in restraint of trade and commerce, Plaintiff and Class members have suffered and continue to suffer injury to their business or property of the type that the antitrust laws were designed to prevent, including deprivation of the benefit of free and fair competition.

151.     Plaintiff and Class members are entitled to treble damages, attorneys' fees, reasonable expenses, costs of suit, and, pursuant to 15 U.S.C. § 26, injunctive and other equitable relief for Defendants' violations of the Sherman Act to correct for the anticompetitive market effects caused by Defendants' and their co-conspirators' unlawful conduct and other relief to ensure that similar anticompetitive conduct does not reoccur in the future.

## REQUEST FOR RELIEF

152.     WHEREFORE, Plaintiff, on behalf of itself and the proposed Class, pray that the Court enter judgement herein, adjudging and decreeing that:

(a)     This action may be maintained as a class action pursuant to Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, with Plaintiff designated as Class representative and its counsel as Class Counsel;

(b)     Defendants have engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and that Plaintiff and Class members have been injured in their business and property as a result of Defendants' and their co-conspirators' violations;

(c)     Defendants, their subsidiaries, affiliates, successors, transferees, assignees, and the respective officers, directors, partners, agents, and employees and all other persons acting or claiming to act on their behalf be permanently enjoined and restrained from continuing and maintaining their contract, combination and conspiracy;

(d)     Plaintiff and Class members be awarded damages in an amount to be proven at trial for the injuries they sustained as a result of Defendants' unlawful conduct and that a judgment in their favor be entered against Defendants, jointly and severally, trebling the awarded damages to the extent permissible under federal antitrust laws;

(e)     Plaintiff and Class members be awarded pre-judgment and post-judgment interest as allowed by law, at the highest rate from the date of service of this Complaint;

(f)     Plaintiff and Class members recover their costs of this suit, including reasonable attorneys' fees and costs as provided by law; and

(g)     Such other relief as the Court deems equitable, appropriate, and just be awarded to Plaintiff and Class members.

## JURY DEMAND

153.     Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff, on behalf of itself and the proposed Class, demands a trial by jury on all issues so triable.

Date: May 28, 2019

**PODHURST ORSECK, P.A.**
***Counsel for Hesh's Seafood, Inc. and***
***the Proposed Class***
SunTrust International Center
One S.E. 3rd Ave, Suite 2300
Miami, FL 33131
Phone: (305) 358-2800/Fax: (305) 358-2382

 /s/ Peter Prieto
Peter Prieto (FBN 501492)
John Gravante, III (FBN 617113)
Matthew P. Weinshall (FBN 84783)
Alissa Del Riego (FBN 99742)
pprieto@podhurst.com
jgravante@podhurst.com
mweinshall@podhurst.com
adelriego@podhurst.com

Kimberly A. Justice
Freed Kanner London & Millen LLC
923 Fayette Street
Conshohocken, PA 19428
Tel.: (610) 234-6487/Fax: (224) 632-4521
kjustice@fklmlaw.com

Steven A. Kanner
Douglas A. Millen
Brian M. Hogan
Freed Kanner London & Millen LLC
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Tel.: (224) 632-4500/Fax: (224) 632-4521
skanner@fklmlaw.com
dmillen@fklmlaw.com
bhogan@fklmlaw.com

Michael K. Yarnoff
Kehoe Law Firm, P.C.
Two Penn Center Plaza
1500 JFK Boulevard, Suite 1020
Philadelphia, PA  19102
Tel.: (215) 792-6676
myarnoff@kehoelawfirm.com

Lesley E. Weaver
Matthew S. Weiler
BLEICHMAR FONTI & AULD LLP
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003/Fax: (415) 445-4020

Eugene A. Spector
William G. Caldes
SPECTOR ROSEMAN & KODROFF, P.C.
Two Commerce Square
2001 Market Street, Suite 3420
Philadelphia, PA 18103
Telephone (215) 496-0300
espector@srkattorneys.com
bcaldes@srkattorneys.com

Guido Saveri
R. Alexander Saveri
SAVERI & SAVERI, INC.
706 Sansome Street
San Francisco, California 94111
Telephone: (415) 217-6810
Facsimile:  (415) 217-6813
guido@saveri.com
rick@saveri.com

***Counsel for Hesh's Seafood, Inc. and the
Proposed Class***